**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-1682-WJM-KMT

CLINT COREY, an individual,

     Plaintiff,

v.

PROFESSIONAL RODEO COWBOYS ASSOCIATION, INC.,
a membership organization,

     Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S
DECLARATION AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

     This matter is before the Court on Defendant Professional Rodeo Cowboys

Association's ("PRCA") Motion for Summary Judgment ("Motion for Summary

Judgment") (ECF No. 45) and Motion to Strike Plaintiff Clint Corey's Declaration

("Motion to Strike") (ECF No. 71).  For the reasons that follow, Defendant's Motion to

Strike is denied, and Defendant's Motion for Summary Judgment is granted in part and

denied in part.[1]

## I.  BACKGROUND

     On February 25, 2019, Plaintiff Clint Corey filed his Amended Complaint against

Defendant PRCA with the Court.  (ECF No. 33.)  Plaintiff was terminated from his

position as the PRCA's Supervisor of Judges, and argues that his termination was

---

[1] Because the Court will grant judgment to Defendant on Plaintiff's Title VII claim and
will decline to exercise jurisdiction over Plaintiff's state law claim, Defendant's Motion to Strike
Plaintiff's Expert Witness (ECF No. 46) is denied as moot.

unlawful under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and Colorado law. (*Id.*) The record establishes the following facts, which are uncontested unless otherwise noted:

Plaintiff was employed by the PRCA as the Supervisor of Judges from 2012 until July 20, 2017, the date of his official termination. (ECF No. 52-1 at 1, ¶ 1.) His role as Supervisor of Judges included the selection, training, assignment, and review of judges working at PRCA events. (ECF No. 33 at 2, ¶ 5.)

During Plaintiff's employment with the PRCA, he and his wife Beverly developed a personal friendship with former PRCA member Jeffrey "Boomer" Reeves. (ECF No. 52-1 at 1, ¶ 2.) Reeves had been in the rodeo business for much of his professional life, and, for a time, Plaintiff trained Reeves to be a PRCA rodeo judge. (*Id.* at ¶ 6.) Reeves lived at Plaintiff's home for some period of time. (*Id*. at ¶ 6.)

At some point in 2014 or 2015, the reasons for which are disputed by the parties, Reeves' PRCA membership card was revoked. (*Id.* at 2, ¶ 5.) Plaintiff asserts that this revocation was a result of Reeves' opposition to the PRCA's then-Chief Operations Officer, Aaron Enget's alleged propensity to sexually harass female PRCA employees. (*Id*.) Defendant asserts that Reeves' membership was revoked because a criminal history check revealed that Reeves had been prosecuted in numerous states for several misdemeanors and at least one felony. (*Id.* at ¶ 6.) Plaintiff testified that, after Reeves' membership was revoked, Enget and Plaintiff's immediate supervisor and then-PRCA Commissioner Karl Stressman suggested that Plaintiff should distance himself from Reeves. (ECF No. 45-4 at 21.)

Sometime in March 2017, Reeves called Stressman and aired his grievances about Enget's alleged sexual harassment of female PRCA employees. (ECF No. 52-1 at 6, ¶ 20.) On March 24, 2017, Plaintiff and Stressman had a lengthy discussion about Reeves' allegations. (*Id.*) During this conversation, Plaintiff stated that he had also witnessed Enget act inappropriately toward female employees, and Plaintiff made clear to Stressman that Plaintiff also was opposed to Enget's conduct. (*Id.* at ¶ 22.) Plaintiff further asserts that, throughout the course of his employment with the PRCA and prior to his March 24 conversation with Stressman, he had occasionally expressed disapproval to Stressman of Enget's workplace misconduct. (*Id.* at 7, ¶ 24.)

On May 21, 2017, Plaintiff informed Stressman via e-mail that he was moving to Texas, but that he would like to continue in his role as Supervisor of Judges. (ECF No. 45-8 at 1.) In that e-mail, Plaintiff stated that he would like to stay in his position, but noted that "[i]f that is not possible to do from Texas, I do understand and will be disappointed to leave the PRCA's employment." (*Id.* at 2.) He offered to stay on through the busy summer season or until the PRCA found a replacement. (*Id.*)

On May 26, 2017, Stressman announced to the PRCA that he would be retiring at the end of 2017. (ECF No. 45-4 at 33.) The same day, Plaintiff and Stressman discussed Plaintiff's move to Texas. (*Id.* at 33–34.) Stressman did not object to Plaintiff working from Texas as long as Stressman was Commissioner, but told Plaintiff that Stressman would need the Board's approval for Plaintiff to work from Texas once Stressman retired. (ECF No. 45 at 7, ¶ 34.)

The Board met on July 10 and 11, 2017, and Stressman informed the Board of

Plaintiff's request to work from Texas. (*Id.* at 8, ¶ 40.) On July 13, Stressman called Plaintiff to inform him that the Board was opposed to Plaintiff's move to Texas. (*Id.* at 8, ¶ 44). Later on July 13, Plaintiff sent an e-mail to the board members explaining why he and his family were moving to Texas, and asking them to reconsider his request to continue his position from Texas. (ECF No. 45-13.) On July 14, Plaintiff moved to Texas. (ECF No. 45 at 9, ¶ 48).

Also on July 14, Plaintiff received an e-mail from the PRCA Chairman of the Board Keith Martin, which stated that the Board would not change its decision. (*Id.* at 9, ¶ 49; ECF No. 45-14). The e-mail stated that "The Board agrees with [Stressman] at this time the Director of Judging should be based in the PRCA office in Colorado. . . . [W]e support [Stressman's] belief that this position requires living in Colorado and being based in the office." (ECF No. 45 at 9, ¶ 49.) Later that day, Stressman and Plaintiff discussed when Plaintiff would return to the office to "discuss what to do through the end of the year." (*Id.* at ¶ 50; ECF No. 52 at 4.)

On July 15, 2017, Plaintiff's wife, Beverly Van Scyoc, made a series of Facebook posts under the name "Beverly Corey" that were critical of the PRCA and particular PRCA board members. (ECF No. 45-16 at 1–2, 4; ECF No. 45-18 at 1.) The post stated:

> IMPORTANT!!!!
>
> Ok the rumors are flying so I will set the record straight. Yes we have moved to Texas. NO Clint has NOT quit his job. HOWEVER the PRCA board is not going to let him work from Texas and be out in the field more to actually see what's going on and "hold judges accountable" and doing what is in the best interest of the Contestants!!! Whatever....So be it! Karl and Clint are trying to figure out

4

> what the next steps are between now and the WNFR.
> THEY BOTH have the members best interest first and
> foremost at their very hearts.  CLINT IS NOT A QUITTER!!
> and he will stick this out until the Board fires him.  If anyone
> would like to know more info feel free to call him directly on
> his cell phone [ ] as he's not about rumors and is always on
> the UP AND UP!!!!
>
> Feel free to share.

(ECF No. 45-16 at 1.)

Beverly Corey's Facebook account later commented on that post several times:

"Here is the email from the board This is their response after 5 years of excellent

service to the members of the PRCA.  Basically just BYE!!."  Ms. Corey then copy-

pasted the July 14 e-mail from Martin.  (*Id.* at 2.)  She then posted, "Funny thing is the

honest board members are calling Clint saying that's not what was said and it was 'kind

of' discussed.  Apparently Clint's so called friend Heith Ford said hell no to him working

from Texas... 'Just fire him.'"  (*Id.* at 4.)  And later added, "I told Clint when this went

down he will find out who his friends ARE and ARE NOT!!!"  (*Id.* at 4.)  Then, "I ONLY

TELL THE TRUTH!!!  I find the facts and tell them.  I call a spade a spade.  People

don't like that but whatever."  (*Id.* at 4.)

Reeves, under the Facebook alias "Mikey Hansome," commented on what

appears to be the same Facebook post, expressing robust disapproval of Enget's

alleged sexual harassment of female PRCA employees.  (ECF No. 45-17; ECF No. 45-

22 at 2.)

> Hey does it bother anyone that the director of rodeo
> administration [Enget] is a sexual predator?  Sexual
> harassment cases settled under the radar, uses members
> money for strip clubs and 1000 dollar cakes for his wife's
> birthday!  And now thanks he is gonna be the new

> commissioner. Arron enget is nothing but a lowlife sexual
> predator! With a salary in the 6 figures and still steals
> money from members for his perverted lifestyle thinks
> woman are nothing but his toys at work to harass! And let's
> not forget Teresa Cobb that has affairs with upper
> management to get in the job she is in! Sleeping with
> married men to then use that to get the job she has!

(ECF No 45-17 at 1.)

On July 20, 2017, Plaintiff returned to Colorado Springs to attend a meeting with Stressman and two other PRCA executives, Mark Knapp (the PRCA's Rodeo Administration Coordinator) and Joe Shafer (the PRCA's Chief Financial Officer). (ECF No. 45 at 11, ¶ 56.) Knapp, unbeknownst to anyone else in the meeting, recorded at least part of the meeting with his phone. (*Id.* at ¶ 57; ECF No. 2 at 7, ¶ 57.) During this meeting, Plaintiff was informed that his employment with the PRCA was being terminated. (ECF No. 45 at 12, ¶ 63.) Plaintiff and the PRCA representatives also discussed both the feasibility of Plaintiff performing his duties in Texas (*id.* at 12–13, ¶¶ 63–64), as well as the July 15 Facebook posts (*id.* at 11–12, ¶¶ 58–62). Stressman referred to the Mikey Hansome post in particular as "really disappointing." (*Id.* at 11, ¶ 60.) It does not appear that Stressman on July 20 thought that Plaintiff or his wife was responsible for the Mikey Hansome post, but he was of the view that Plaintiff and his wife "controlled" the account. (ECF No. 45-11 at 6.)

After the meeting, Stressman sent Plaintiff a letter dated July 27, 2017. (ECF No. 45-20.) The substance of the letter is set forth below:

> Undoubtedly, these last few weeks have been difficult. You
> are a good man, a Champion, and I consider you a friend. I
> understand why you and Beverly felt that a move to Texas is
> best for your family and I truly do wish you great success in

that effort.  However, given the nature and tone of recent public social media posts from your family, I want to take a moment to recap how we arrived here so that at a minimum you may understand recent events from my viewpoint.

Prior to your move, as you will recall, you approached me in May and told me that you were moving to Texas and that you would like to, if possible, retain your position without being based in the office or Colorado Springs.  I was a little surprised that you hadn't asked first if your position could be maintained if you moved away, but simply informed me that you were moving and it was done.

As you know, I discussed this issue with the Board, and they felt that this position could not be maintained from the field and that you needed to be based in Colorado Springs to manage your work and the employee reports under you.  I relayed this information to you, and you then asked whether you could live in Colorado Springs for six months to finish out the year.  I did take that question seriously and intended to discuss this new request with the Board.

Unfortunately, just after asking me about that possibility, your family's social media postings regarding your position escalated.  The posts stated untruths, were personal as to the PRCA and Board members, published written communication from the Board to you, and frankly put you in an untenable position.  Importantly to me, you even posted that the folks at the PRCA questioned your integrity.  Let me be clear as this is important not only to you, but to me as well.  Clint, no one ever questioned your integrity at the PRCA.

However, because of this flurry of social media postings, you eroded any support you may have had and this made it impossible for you to be able to stay on as Director of Judging no matter where you were based.  Effectively, your move to Texas was a resignation of your employment and the inaccurate public blasting of the PRCA made it impossible to consider any possibility of an accommodation of your later request.

Related to your family social media posts, I must also address Facebook postings under the screen name of "Mikey Hansome."  When we met in my office with Joe and

> Mark last Thursday, you told me this was not your Facebook
> account, but that you knew who controlled it. Clint, you have
> directly stated to Mark Knapp, Aaron Enget and other folks
> we both know in the past that this account was controlled by
> you and Beverly. They have been clear with me on this
> topic.
>
> This account has been used to publish vicious, damaging
> and slanderous personal attacks and lies. If these
> slanderous and untrue social media attacks continue, we will
> be forced to bring suit to end these untruths. I ask that you
> please see that these slanderous attacks stop.

(ECF No. 45-20 at 1–2.)

In July 2018, Plaintiff filed the instant lawsuit. (ECF No. 1.) Plaintiff seeks to recover damages under Title VII, arguing that his "termination was motivated in significant part by his opposition to PRCA's acts of discrimination, and by his relationship to others that opposed discrimination and sexual harassment." (ECF No. 33 at ¶ 19.) Plaintiff also brings a claim against Defendant under Colorado Revised Statute § 24-34-402.5, which prohibits an employer from terminating an employee for engaging in a lawful off-site activity. (*Id.* at ¶¶ 22–27.) He argues that his "lawful off-site activity" was his friendship with Reeves. (*Id.* at ¶¶ 22–25.)

On June 27, 2019, Defendant filed a Motion for Summary Judgment. (ECF No. 45.) On July 12, 2019, Plaintiff filed a Response (ECF No. 52), and attached a declaration by Plaintiff ("Plaintiff's Declaration) (ECF No. 52-1). On August 9, 2019, Defendant filed a Reply (ECF No. 66). On August 21, 2019, Defendant filed a Motion to Strike Plaintiff's Declaration (ECF No. 71). On September 4, 2019, Plaintiff filed a Response to Defendant's Motion to Strike (ECF No. 75), and on September 9, 2019, Defendant filed a Reply (ECF No. 76). Both motions are ripe for consideration.

## II.  LEGAL STANDARDS

### A.  Motion to Strike a Declaration

A decision whether to grant or deny a motion to strike lies "within the sound discretion of the district court."  *Fed. Deposit Ins. Corp. v. Isham*, 782 F. Supp. 524, 530 (D. Colo. 1992).  "[A]n affidavit may not be disregarded solely because it conflicts with the affiant's prior sworn statements.  In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue."  *Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)) (internal quotation omitted; alteration incorporated).

In determining whether an affidavit creates a sham fact issue, a court considers whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."  *Law Co.*, 577 F.3d at 1169 (internal citation omitted).

The Tenth Circuit has "described cases in which an affidavit raises but a sham issue as 'unusual.'" *Id.* (citing *Franks*, 796 F.2d at 1237).  Indeed, "[m]otions to strike are disfavored, especially in the context of motions for summary judgment."  *Lobato v. Ford*, 2007 WL 2593485, at *11 (D. Colo. Sept. 5, 2007).

### B.  Motion for Summary Judgment

Summary judgment is appropriate only if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc*., 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49 (1986); *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132 (10th Cir. 2000). The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### III. DEFENDANT'S MOTION TO STRIKE

Because Defendant's Motion for Summary Judgment requires the Court to examine the record evidence, *see* Fed. R. Civ. P. 56, the Court first must determine whether Plaintiff's Declaration should be considered. In other words, the Court must rule on Defendant's Motion to Strike before a ruling on Defendant's Motion for Summary Judgment can be made.

Defendant argues that certain statements made in Plaintiff's Declaration, filed in opposition to Defendant's Motion for Summary Judgment, contradict Plaintiff's prior deposition testimony. Consequently, Defendant argues, Plaintiff's Declaration constitutes an attempt to create a "sham" fact issue, and should be stricken from the record. (ECF No. 71.)

The Court will not address in detail each statement in Plaintiff's Declaration that Defendant alleges contradict statements made in Plaintiff's deposition testimony. The

Court has reviewed the statements and find that they are not manifestly contradictory, and indeed, the relevant assertions are, for the most part, internally consistent.

Moreover, in several instances, Defendant in its Motion to Strike simply references paragraphs in Plaintiff's Declaration that it asserts contradict Plaintiff's deposition testimony, without actually explaining to the Court what statements are contained in those paragraphs, how they contradict with Plaintiff's deposition testimony, or why such contradictions would constitute an attempt by Plaintiff to create a sham fact issue. (ECF No. 71 at 6.) Arguments not raised or inadequately developed in an opening brief are waived. *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013) (deeming waived an argument inadequately developed in opening brief); *Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1148 n.3 (10th Cir. 2008) (same); *Rojem v. Gibson*, 245 F.3d 1130, 1141 n.8 (10th Cir. 2001) (same). The Court will not construct arguments on Defendant's behalf, and Defendant has forfeited the argument by inadequately developing its position. Accordingly, Defendant's Motion to Strike is denied.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff sets forth three theories of Defendant's liability under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a). Plaintiff argues that he was unlawfully terminated on July 20, 2017 because of (1) Reeves' opposition to Enget's alleged misconduct (a third-party retaliation claim); (2) Plaintiff's own opposition to Enget's alleged sexual misconduct as communicated to Stressman on March 24, 2017 and in the Mikey Hansome Facebook post; and (3) Plaintiff's friendship with Reeves (ECF No.

33 ¶ 19.)  As noted above, Plaintiff also brings a claim under Colorado law.  These claims will be addressed in turn.

## A.    Third-Party Retaliation Against Reeves

Title VII provides in relevant part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).

In *Thompson v. North American Stainless, LP*, 562 U.S. 170, 173–75 (2011), the Supreme Court concluded that an employer's adverse action taken against a third party may, under certain circumstances, constitute unlawful retaliation against an employee. In *Thompson*, the plaintiff and his fiancé were both employed by the defendant employer.  *Id.* at 172.  Shortly after the plaintiff's fiancé filed an EEOC charge of discrimination against the employer, the plaintiff was fired.  *Id.*  The plaintiff brought a Title VII claim against the defendant employer, arguing that his firing constituted unlawful retaliation against his fiancé.  *Id.*  The Court concluded that the plaintiff had standing to bring the claim, and that "if the facts alleged by [the plaintiff] are true, then [the defendant]'s firing of [the plaintiff] violated Title VII."  *Id.* at 173, 177.

As *Thompson* and the plain language of Title VII make clear, for Plaintiff to survive Defendant's Motion for Summary Judgment as to his third-party retaliation claim, Reeves must have been employed by or applying for employment with the PRCA at the time he was allegedly retaliated against (*i.e.*, at the time Plaintiff was fired).  *See* 42 U.S.C. § 2000e-3(a); *Thompson*, 562 U.S. at 173–175; *Underwood v. Dep't of Fin.*

*Servs. State of Fla.*, 518 Fed. App'x 637, 643 (11th Cir. 2013).

Defendant argues that Reeves was never an employee of the PRCA, and there is evidence in the record to support that assertion. For example, Kirk LaPoure, then the Chief Financial Officer of the PRCA, states in his Declaration that, "The PRCA's records do not show that Jeffrey Reeves has ever been an employee or independent contractor for the PRCA. I searched the PRCA's accounting and payroll records and did not find any payments, pay stubs, or W-2, W-4, W-9 or 1099 tax forms." (ECF No. 45-1 at 2, ¶ 9.)

Plaintiff appears to concede that Reeves was not an employee of the PRCA in July 2017 when Plaintiff was fired. (ECF No. 52 at 30.) Plaintiff argues that Reeves was an employee to the extent Reeves retained his PRCA membership card. (*Id.* at 10.) But, by Plaintiff's own admission, Reeves' membership card was revoked in 2015. (ECF No. 45-4 at 19.) Plaintiff instead asserts that Reeves was applying for employment with the PRCA at the time Plaintiff was fired. (ECF No. 52 at 30.) In support of this assertion, Plaintiff cites to a letter sent on July 25, 2017, from Enget to Reeves, which reads:

> Mr. Reeves,
>
> The PRCA has received your application for membership via email on June 27, 2017. Research completed by this office regarding your membership found no evidence or documentation showing that you have completed the requirements to obtain or hold a barrelman/clown or bullfighter endorsement.
>
> Per PRCA Bylaw B1.2.7 your application for membership is denied. . . .

(ECF No. 52-7 at 1.)

In response, Defendant argues that the above letter reflects only that Reeves was applying for PRCA *membership*—and, while employees of the PRCA must first become members, not all PRCA members are employees of the PRCA. Defendant contends that Plaintiff has, in various filings with the Court, conceded as much; for example, Plaintiff in his Declaration states: "[T]he PRCA told me that Reeves' membership card had been revoked, thereby rendering him *ineligible* for employment." (ECF No. 52-1 at 2 (emphasis added).)

The Court also notes that in Defendant's Motion for Summary Judgment, Defendant states: "The PRCA has over 4,000 active members and . . . has approximately 70 employees." (ECF No. 45 at 3, ¶¶ 2–3.) Plaintiff in his Response conceded these statements to be true. (ECF No. 52 at 4.) Thus, by Plaintiff's own admission, being a member of the PRCA is not sufficient to be considered, at least by the PRCA, an employee.

In support of Plaintiff's argument that Reeves was applying for employment with the PRCA, he also cites to two paragraphs of his Declaration. These statements, however, simply do not speak to whether Reeves was applying for employment with the PRCA. The Court finds nothing in the record that would support an inference that because Reeves was applying for PRCA membership, he was therefore applying for employment with the PRCA. The Court concludes that, based on this record, no reasonable factfinder could conclude by a preponderance of the evidence that Reeves was applying for employment with the PRCA. Thus, Plaintiff cannot state a third-party claim for retaliation in violation of Title VII, and the Court grants summary judgment in favor of Defendant on this theory of liability.

14

**B.     Retaliation For Plaintiff's Protected Activity**

Plaintiff also claims that he was discharged by Defendant because of his March 24, 2017 conversation with Stressman in which he expressed opposition to Enget's alleged workplace misconduct, and the Mikey Hansome Facebook post.  (ECF No. 52 at 25–30.)

In the absence of direct evidence, a plaintiff may prevail on a retaliation claim if he can to establish discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016).  Under the *McDonnell Douglas* three-step analysis, a plaintiff must first set forth a prima facie case of retaliation.  *Id.*  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory basis for its employment decision.  *Id.*  If the defendant does so, the inference of discrimination drops out and the burden shifts back to the plaintiff.  *Id.*

In the Tenth Circuit, a plaintiff bringing a retaliation claim "must first make out a prima facie case of retaliation by showing (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008)).  "[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a *but-for cause* of the alleged

adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,
363 (2013) (emphasis added).  "A causal connection may be shown by evidence of
circumstances that justify an inference of retaliatory motive, such as protected conduct
closely followed by adverse action."  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248,
1253 (10th Cir. 2001) (internal quotation marks and citation omitted).  The Tenth Circuit
permits plaintiffs who raise retaliation claims "to establish a prima facie case of
discrimination by showing only close proximity in time between a protected activity and
an adverse action."  *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 n.5 (10th Cir. 2008).
"Unless there is very close temporal proximity between the protected activity and the
retaliatory conduct, the plaintiff must offer additional evidence to establish causation."
*Id.* (citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997)).

    1.    <u>March 24, 2017 Conversation</u>

On March 24, 2017, "Corey had a long conversation with Stressman about
Reeves' allegations" during which Plaintiff stated that he had seen Enget act
inappropriately and that he opposed Enget's conduct (the "March 24 Conversation").
(ECF No. 52-1 at 6, ¶¶ 20, 22; ECF No. 71-1 at 38.[2])  Plaintiff was officially terminated
on July 20, 2017, just shy of four months after he spoke with Stressman about the
allegations against Enget.

Defendant does not seriously contest either that March 27 Conversation

---

[2] Defendant cites page 105 of Plaintiff's deposition testimony in its reply, but did not
include page 105 of Plaintiff's deposition in its exhibits.  (*See* ECF No. 66 at 105; ECF No. 66-1
at 6–7.)  Page 105 was submitted to the Court in the briefing on the Motion to Strike, and thus
the Court cites to the relevant exhibit from that briefing.  (ECF No. 71-1 at 38 (page 105 of
Plaintiff's deposition).)

opposing Enget's alleged sexual misconduct constitutes protected activity,[3] or that being fired is a materially adverse employment action. (*See* ECF No. 45 at 21.) Defendant's argument is that the requisite causal connection between Plaintiff's protected conduct and his eventual firing is lacking. (ECF No. 66 at 14–15.)

"[I]f the adverse action occurs three months out and beyond from the protected activity, then the action's timing alone will not be sufficient to establish the causation element." *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). Because Plaintiff was fired nearly four months after he engaged in the protected activity, Plaintiff must provide "additional evidence" of causation. *See id.*

With respect to the lack of temporal proximity between Plaintiff's protected conduct and his termination, Plaintiff asserts:

> [A]ny delay between [Plaintiff]'s conversation with Stressman and the PRCA's ultimate retaliatory act—termination—was caused in part by Stressman's delay in speaking to the board of directors about [Plaintiff]'s request to work remotely from Texas. . . .
>
> The circumstances strongly suggest that Stressman delayed his negative recommendation to the Board so that [Plaintiff] would become so committed to his move from Colorado to Texas that he would be put in a very difficult position once told that the Board would not approve his working remotely.

(ECF No. 52 at 27.) In other words, Plaintiff explains that the nearly four-month lapse

---

[3] Defendant in its Reply in Support of its Motion for Summary Judgment states, without argument, that "[t]he PRCA disputes that the March 24 conversation constitutes protected activity." Again, arguments not raised or inadequately developed are waived or forfeited, and the Court declines to construct arguments on Defendant's behalf. *See Hunter*, 739 F.3d at 495; *Thompson R2-J Sch. Dist.*, 540 F.3d at 1148 n.3; *Rojem*, 245 F.3d at 1141 n.8.

between Plaintiff's protected activity and his ultimate discharge is partly attributable to Stressman's delay in relaying to the Board Plaintiff's request to move to Texas.

Plaintiff does not endeavor to explain, and it is not clear to the Court, why this delay supports an inference of causation between Plaintiff's comments to Stressman regarding Engel and Plaintiff's termination. Plaintiff also asserts that Stressman was not forthcoming with Plaintiff about his recommendation to the Board. But Plaintiff does not explain, and it is not otherwise clear, how evidence supporting that assertion would constitute additional evidence of a causal link between the March 24 Conversation and Plaintiff's termination.

Additionally, Defendant points out that Plaintiff had complained to Stressman about Enget's behavior prior to Plaintiff and Stressman's March 24 conversation. (ECF No. 45 at 22.) Consequently, Defendant contends, "[t]here is no rational basis to infer that Stressman would repeatedly allow [Plaintiff] to criticize Enget's language only to terminate [Plaintiff] for that criticism years later." (*Id.* (citing *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006).) The Court agrees that the uncontested fact that Plaintiff had previously complained to Stressman about Enget's misconduct (ECF No. 52-1 at 7, ¶ 24), apparently without adverse consequence, weakens the causal link between Plaintiff and Stressman's March 24 Conversation and Plaintiff's eventual termination.

On the present record, the Court finds that Plaintiff has failed to present evidence from which a jury could reasonably infer a causal link between the March 24 Conversation and Plaintiff's termination. Plaintiff has thus failed to state a prima facie case of retaliation arising out of the March 24 Conversation.

2.    The Mikey Hansome Facebook Post

Plaintiff also contends that the PRCA fired him because of his association with the Mikey Hansome Facebook post that accused Enget of being, among other things, a "sexual predator."  (ECF No. 52 at 28.)

No party claims that Plaintiff authored the Mikey Hansome Facebook post, and thus it is undisputed that Plaintiff himself did not engage in protected activity.  However, Plaintiff asserts in a footnote that,

> Here it is noteworthy that despite the fact that Corey did not make the post himself, he was nonetheless identified with it in significant part.  This was because Corey had, in the March 24 conversation, discussed with Stressman similar remarks made by Reeves (of which Stressman was long aware), and Corey indicated that he agreed with them.  That, and the fact that Corey controlled the Facebook page in question, reinforced the conclusion that the Facebook post was a continuation of Corey's opposition to Enget's behavior discussed on March 24, 2017.

(ECF No. 52 at 28–29 n.2.)

Plaintiff's suggestion that the Mikey Hansome Facebook post is protected activity, is both factually and legally deficient.  Plaintiff suggests that he was fired "because of the . . . Facebook post" and "allegations, attributed to Corey by key decision makers, of a sexually hostile workplace."  (*Id.* at 28; *id.* at 29–30.)  However, Plaintiff does not argue that the Mikey Hansome Facebook post itself criticizing Enget and the PRCA was "protected opposition to discrimination."  *See Twigg*, 659 F.3d at 998.  Nor does Plaintiff explain how actual or perceived control of a Facebook account can constitute protected activity when it is undisputed that Plaintiff did not post the comment.  Nor does Plaintiff make any meaningful attempt to argue that Stressman or

any PRCA Board member *perceived*, at the relevant time, that Plaintiff had himself posted the critical comment.

Moreover, even if Plaintiff had asserted these arguments and factual support therefor, Plaintiff does not address the legal issue of whether the Mikey Hansome Facebook post is protected activity on the part of Plaintiff if the PRCA *perceived*, whether or not the perception was accurate, that Plaintiff controlled the Mikey Hansome Facebook account. On this point the Court notes that there is no clear Tenth Circuit authority establishing whether *perceived* protected activity may form the basis of a Title VII retaliation claim.

It is true that the Third Circuit has recognized the "perception theory" of retaliatory discharge in instances where an employer mistakenly believes that an employee has engaged in protected activity, and that activity forms the basis for an adverse employment action against the employee. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 571 (3d Cir. 2002) ("[W]e have consistently held that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken belief that the employee engaged in protected activity."). Thus, at least in the Third Circuit, even though the employee did not *actually* engage in protected activity, he or she may nevertheless bring a statutory retaliation claim. *Id.* at 567 (recognizing that the anti-retaliation provisions in the Americans with Disabilities Act and the Age Discrimination in Employment Act are nearly identical to the anti-retaliation provision of Title VII).[4]

---

[4] *See also Grosso v. City Univ. of New York*, 2005 WL 627644, at *3 (S.D.N.Y. Mar. 16, 2005) ("[T]he language of 42 U.S.C. § 2000e-3(a) is consistent with the 'perception theory' of

Not recognizing a cause of action in the case where an employer fires an employee when it mistakenly believes that the employee engaged in protected activity could create an unintended loophole in the laws intended to prevent retaliation. The Supreme Court recognized this potential loophole in the context of First Amendment retaliation by demotion or discharge in *Heffernan v. City of Paterson, N.J.* 136 S. Ct. 1412, 1418 (2016). The Supreme Court held that an employee has a First Amendment retaliation claim when an employer mistakenly believes that an employee has engaged in political activity and demotes the employee to prevent the employee from engaging in that activity. *Id.* ("In a word, it was the employer's motive, and in the particular the facts as the employer reasonably understood them, that mattered."). The Seventh Circuit has also indicated that it is open to extending the *Heffernan* analysis to Title VII retaliation claims, although it has not had the opportunity to do so. *Scheidler v. Indiana*, 914 F.3d 535, 543 (7th Cir. 2019) (distinguishing *Heffernan* as a First Amendment claim rather than a Title VII retaliation claim, but noting that the court was "open to persuasion by analogy").

The Tenth Circuit has not addressed this question in the Title VII context. However, it has held that, consistent with *Heffernan*, a defendant's belief that a plaintiff leaked statements to the press, despite the plaintiff's denial that she did so, is not fatal

---

retaliatory discrimination."); *Johnson v. Napolitano*, 686 F. Supp. 2d 32, 37 (D.D.C. 2010) (finding that a plaintiff identified a genuine issue of material fact on her Title VII claim of retaliation based on the perception theory of retaliation); *Murphy v. D.C.*, 390 F. Supp. 3d 59, 70 (D.D.C. 2019) (finding that the perception theory of Title VII retaliation is valid). *But see McKinney v. Bolivar Med. Ctr.*, 341 F. App'x 80, 83 (5th Cir. 2009) (noting that the Fifth Circuit has not adopted the perception theory of retaliation); *Carter v. Columbia Cnty.*, 597 F. App'x 574, 580 (11th Cir. 2014) (same).

to a First Amendment retaliation claim. *Bird v. W. Valley City*, 832 F.3d 1188, 1212 (10th Cir. 2016). In another First Amendment retaliation case, the Tenth Circuit observed that "a defendant's *belief* that the plaintiff engaged in a constitutionally protected activity is enough to satisfy" the requirement that a plaintiff engage in constitutionally protected activity in some circumstances. *Cowley v. W. Valley City*, 782 F. App'x 712, 720 n.8 (10th Cir. 2019) (emphasis in original). Elsewhere, the Tenth Circuit has also described the standard for a Title VII retaliation claim as "analogous to the standard used in First Amendment retaliation cases." *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018). Given these statements by the Tenth Circuit, a credible argument could be made that the court would be receptive to expanding the perception theory of retaliation to claims brought under Title VII.

The fact remains, however, that the perception theory of Title VII retaliation has not yet been recognized in this Circuit. Apart from that, Plaintiff has wholly failed to develop any argument for the extension of the perception theory of retaliation to the facts of his case. The Court will not address and decide arguments not meaningfully raised or adequately developed by the parties and, as previously noted, such abandoned arguments are waived. *Hunter*, 739 F.3d at 495; *Thompson R2-J Sch. Dist.*, 540 F.3d at 1148 n.3; *Rojem*, 245 F.3d at 1141 n.8.

In sum, Plaintiff failed to raise the factual basis or develop the legal argument that the Mikey Hansome Facebook post was Plaintiff's protected activity based on a perception theory of retaliation. Nor has Plaintiff put forth any argument that control of a social media account is sufficient to show engagement in protected activity. On the

record before it, the Court finds that no reasonable factfinder could determine that Plaintiff engaged in protected activity on the basis of such conduct.  Plaintiff has therefore failed to state a prima facie case of Title VII retaliation based on the Mikey Hansome Facebook post.

As a consequence,  the Court grants summary judgment to the Defendant on Plaintiff's Title VII retaliation claim predicated on his own alleged protected activity, both as a result of the March 24 Conversation and the Mikey Hansome Facebook post.

**C.     Retaliation for Plaintiff's Friendship with Reeves**

Plaintiff also appears to argue that Defendant violated Title VII by firing him because he was friends with Reeves.  The basis for this legal theory is Plaintiff's assertion that a friendship with a person who engages in protected activity itself constitutes protected activity.

Plaintiff does not point the Court to any legal authority which would support the proposition that friendship can constitute protected activity.  The Seventh Circuit has concluded that friendship with and the giving of "spiritual guidance" to a person who has engaged in protected activity is not protected activity.  *Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998).  Especially in light of the fact that Plaintiff has not directed the Court to any contrary legal authority, the Court finds this theory of liability to be without merit and grants summary judgment in favor of Defendant on this theory.

**D.     Plaintiff's State Law Claim**

Because the Court will grant judgment to Defendant on Plaintiff's Title VII claim, the Court will exercise its discretion under 28 U.S.C. § 1367(c)(3) to decline jurisdiction

over Plaintiff's state law claim.[5]  Accordingly, Plaintiff's state law claim will be dismissed without prejudice.  Defendant's Motion for Summary Judgment as to Plaintiff's state law claim is therefore denied.

## V.  CONCLUSION

In accordance with the foregoing, the Court ORDERS as follows:

1.    Defendant's Motion to Strike Plaintiff's Declaration (ECF No. 71) is DENIED;

2.    Defendant's Motion for Summary Judgment (ECF No. 45) is GRANTED as to Plaintiff's Title VII claim and DENIED as to Plaintiff's state law claim;

3.    Plaintiff's State Law Claim is DISMISSED WITHOUT PREJUDICE;

4.    Defendant's Motion to Strike Plaintiff's Expert Witness (ECF No. 46) and Defendant's Motion in Limine (ECF No. 89) are DENIED AS MOOT;

5.    The Final Trial Preparation Conference and Jury Trial in this matter are VACATED;

6.    The Clerk of Court shall enter judgment in favor of Defendant and against Defendant on Plaintiff's Title VII claim, dismiss the state law claim without prejudice, and terminate the case; and

7.    Defendant shall have its costs upon compliance with D.C.COLO.LCivR 54.1.

---

[5] While Plaintiff appears to be a citizen of Texas for purposes of diversity jurisdiction, Plaintiff makes no argument as to what the citizenship of Defendant would be.  In any event, the Court assumes without deciding that diversity jurisdiction is lacking in this case.

Dated this 7th day of February, 2020.

BY THE COURT:

_____
William J. Martinez
United States District Judge